Council and Miller v. Mercuria Energy at all. Thank you, Your Honor. May it please the Court. This Court has held time and again that contracts must not be construed in ways that render any of their terms superfluous or meaningless or that would alter the terms of the bargain of the contracting parties. By granting the motion to dismiss here, the District Court effectively erased essential contract terms and destroyed the value of the contract for Jeffrey Miller, the plaintiff. And this was reversible error for four distinct reasons. The District Court's first error was to ignore the plain language of the separation agreement, which maintains Mr. Miller's carried interest rights. Jeffrey Miller, who is in the courtroom today, separated from Mercuria in 2012 after four and a half years of service. They negotiated a separation agreement that maintained and protected his 100 percent vested carried interest right to participate in the profits. The problem is that it was at least a problem that I think we have to address here, is the extent to which the agreement can be divorced from the transaction, the Roche transaction. That's — And you say it can be. The other side says it can't be. And there's no question about that transaction being referred to in the agreement and that also the agreement does indicate that it may not take place. That's exactly right, Your Honor. So your client was clearly on notice before signing the agreement that it might not take place. That's exactly right, Your Honor. And that's why it's important to point out that the contract serves two functions. And the first is that it affirms Mr. Miller's general contract right that preexisted and was reaffirmed and maintained in the preamble of the agreement, page 1, and that's A764. It says that Mr. Miller's investment carried interest rights are maintained and in the preamble of section 5, which discusses — He still has those rights. That's what they're saying. That is exactly what they're saying. And we would ask the court to be — we think that is a cynical argument. Mercuria has stripped ULA — and this is clearly pled — of all of its assets. The Glaco oil field now belongs to Phoenix. Yeah. And 99.96 percent of the stock of ULA, all of Mercuria's holdings, went to Phoenix. .04 percent is left in ULA. That's Mr. Miller's share. The question is, did the contract protect him against that? That's exactly right. So that's the question, Your Honor. And while, of course, the Roche transaction is described and there is conditional language that it may happen, but there are guarantees, what the contract also says separately is Mr. Miller and Mercuria have this relationship. And in fact, what the separation agreement says is that in consideration for your work for Mercuria, not for ULA, you currently hold the Glaco shares, which grant you the right to receive a preferred liquidation quota, and you have a predetermined redemption right if certain reorganizations happen. And it does not say that should the Roche transaction not close, those rights evaporate. And the district court's interpretation effectively erased Mr. Miller's preexisting rights from the contract. Well, you're saying effectively it doesn't, but we have to really look through the contract to see that — you're really asking, it seems to me, for some sort of equitable relief here, because the contract, strictly according to its terms, leaves the rights in place. Granted, because there was this other transaction, it strips — he has no — they have no value now. But I don't know that that's — I'm still uncertain about how the contract protects him. Well, Your Honor, we would not agree respectfully that we're asking for equitable relief. We would say that this contract, signed by the Mercuria entities, is their incorporation fully of the obligations of ULA. And the district court grappled with that question, but ultimately concluded, no, it's not a full incorporation. It's a limited incorporation of ULA's rights. Relying on the progressive case from this court, we believe that was entirely incorrect. The progressive case is a case in which the parties were deemed to have consented to arbitration based on their contract's single reference in a single clause to a 12-year-old prior contract that had an arbitration clause. And that was deemed enough to incorporate all of the obligations of that prior contract. Here, the separation agreement insists in five different places that ULA's articles of association bind here and that Mr. Miller's rights are subject to them, which means that Mercuria has repeatedly, five times over, acknowledged Mr. Miller's rights and adopted them as its own because this contract exists to, quote, maintain those rights and because it is in consideration for the work Mr. Miller did for Mercuria. Now, this contract is not a model of clarity. I think we would not be candid if we said it were. But there is also the point that should have been deemed ambiguous. And the district court erred also in ruling that it ambiguously destroyed Mr. Miller's contract rights. It is this court's familiar doctrine, in many cases, including Olin in 2017, that contract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person examining the entire integrated agreement and the context of industry custom and practice. And here, the idea that Mr. Miller gave away a valuable 100% vested carried interest right in an oil field project he had worked on for years, effectively for nothing, because if a particular transaction didn't close in a way that only Mercuria unilaterally controlled, the idea that that's what those clauses mean, we would argue, is not a reasonable interpretation and that, at best, is ambiguous. Turning briefly to the issue You've given us two errors by the district court that you say took place. Are there any others? So we believe there were four. One, that the plain language maintaining Mr. Miller's rights were ignored. Two, this limited incorporation concept, which we believe was clearly error under progressive. Three, the error of ruling that the contract was unambiguous, where the language is truly complex and ambiguous when interpreted in understanding reasonably what it means and what industry custom and practice was. And then four, deeming the defendants, most of the defendants, ULA, Phoenix, the other Mercuria signatories, as not insufficiently closely related to the other Mercuria entity, such that there was no personal jurisdiction over them. The Mercuria entities are all signatories to this agreement. ULA was 99.96% owned by Mercuria until its value was transferred to Phoenix. The separation agreement releases cover all of the Mercuria entities and their affiliates. The separation agreement disclaimer of representations and warranties expressly names and protects ULA and all the Mercuria affiliates. And Phoenix came into existence in order to effectuate this transaction and is 80% owned by Mercuria. So the idea that these entities are too distant from the transaction or didn't play an active role in the transaction is incorrect. Again, probably the most important two portions of the contract that make Mr. Miller's rights clear are on page A764, which is the preamble to the agreement, which states that the agreement has been reached between Mercuria and Miller as to resolution of various issues related to the carried interest rights you maintain in certain investments involving Mercuria and its affiliates. That is the very beginning of the contract. And it sets out the purpose, which is for Mr. Miller to leave the company with his rights. I understand that. So you have to argue then that notwithstanding the fact that the rights, the other side says the rights weren't affected, by eliminating the value of those rights, they in effect destroyed the rights themselves. That's right, Your Honor. That's key. If we were to rule in your favor, we would have to find that. We would have to find that Mercuria recognized, adopted, and acknowledged Mr. Miller's rights in the Glaco oil field and shouldered the burden of paying him for those rights, because that is what he was 100% entitled to when he left the company. Is that also the record site you gave us there is 764, is it? That's the preamble, Your Honor. And then section 5A, Roman 5A, is at 771. That's the beginning of the section that discusses Glaco and says that in consideration for Mr. Miller's work for Mercuria, he has the redemption rights in the oil field. Let me ask you a threshold question about personal jurisdiction. ULA has no jurisdictionally relevant contact with New York. Wouldn't you agree with that? Well, Your Honor, Mercuria owns 99.96% of ULA. And ULA was created by the head of Mercuria selling personally to Mr. Miller his shares of ULA. It is a shell holding company constructed to own these assets. So formally, it is in Spain, but it was created by Mercuria to hold this asset. And to give them a free pass here is entirely unfair and fails to recognize how closely related they are to Mercuria. It isn't in separate and existing entity other than to hold the Glaco asset, which has now been stripped from it. And Phoenix Global? Yes, Your Honor. What's its jurisdictionally relevant contact with New York? I'm not sure if I'm following this. Again, Mercuria owns 80% of Phoenix, and it was brought into existence to effectuate this deal. So if you look at the separation agreement and recognize that it must be interpreted here in New York, then the fact that Phoenix was created in part to strip assets away from Mr. Miller makes it sufficiently closely related to the Mercuria entities that signed the separation agreement. And this is under the Leviton test from 942 F sub second. The question is, is it foreseeable that these entities would be subject to this court's jurisdiction? This is the so-called closely related doctrine, right? That's right, Your Honor. As a basis for the district court's exercise of personal jurisdiction. And what's the state of the law in our circuit on the closely related doctrine? Well, the factors that are set out in various cases are that a non-signatory, for example, can be bound if the entity is either incorporated by reference or there's agency or assumption, veil-piercing or alter ego. There's a number of standards. We haven't applied it in order to enable a signatory to enforce a form selection clause against a non-signatory, right? We're not aware of a case from the circuit doing so, but the district courts have done so repeatedly, Your Honor. In recognition that there are numerous factors that may make that the more reasonable and frankly avoid the consequence of a case like this, where you have all these closely related entities and they're trying to slip out of their obligations. And what's the applicable law? Is it federal law or New York state law that governs the adoption or the elaboration of the closely related doctrine? Well, I would say that that has not been briefed, and I would certainly be happy to do so if it assists the court. This is a contract matter overall, and so I would lean towards saying New York state law, but I do not want to speak with certainty, Your Honor. We'd be happy to brief that if it would be of benefit to the court. We'll let you know if that's helpful. Thank you, Your Honor. Go ahead. May it please the court, Maren Shaw from Quinn Emanuel for the Mercuria Parties. And I want to start by directly addressing one of the key themes that I think Your Honor's picked up on in Mr. Miller's argument, which is that if the separation agreement is read to apply only to the Roche merger, as the district court properly concluded, then Mr. Miller is somehow being stripped of all of his vested, carried interest rights and left with nothing. Now, that is simply not true, and it's not a position that the Mercuria Parties have ever taken in this litigation. And the separation agreement speaks clearly to this, and I want to direct Your Honor's attention very quickly to page A777 of the record. It's little Romanette 7, entitled Limitation on Redemption of Preferred Shares. And this is a key provision, because what it says- Page again? 777, and it's little Romanette 7 again. And it says explicitly, for the avoidance of doubt and notwithstanding anything to the contrary expressed herein, your right, Mr. Miller's right, to be issued shares in the hold co, which is a defined term, and I'm going to come back to that redemption events, another defined term, occurs. Barring either one of the redemption events occurring, your preferred shares will at all times be dealt with pursuant to and in accordance with ULA's articles of association and, as applicable, the laws of Spain or the relevant jurisdiction. But your right to be issued shares in the hold co shall not be deemed to have arisen at any time whatsoever. This could not be more clear, and what it is saying is that if either of the two defined redemption events in the agreement don't occur, which the agreement expressly does not guarantee they ever will, then Mr. Miller keeps the ULA shares that he already had, and they continue to be governed by the ULA articles of association as they always were. And the fact is, Mr. Miller does have recourse if he now believes that the Phoenix transaction entitled him to a redemption on those shares. He could bring that claim in Spain against ULA under the ULA articles that still govern those shares. He hasn't done this. He's chosen not to. What he cannot do is try to bring that claim in this court, in New York, against the Mercuria parties, who are not signatories to or bound by ULA's articles of association, and try to disguise it as a claim arising under the separation agreement. And this actually makes perfect commercial sense in the context of this agreement, because what this agreement did is it gave Mr. Miller the option of participating in the potential upside of the specific new transaction that he was working on at the time the separation agreement was signed, and that's the Roche merger, and they offered him the option of exchanging his existing ULA shares that he already held for shares in the new Mercuria Roche company before that company underwent a value-creating event, an IPO event or an equity sale. And if that never happened, which it didn't here, then he simply retains the ULA shares that he already had, and they continue to be governed by the ULA articles. And that's precisely what's happened here. There is absolutely no unfairness to it. And you can see that very clearly in the plain text of the contract, which the district court properly found. And I know my time is running a little short, but I do want to point your honors to the specific definitions, because the fact is that the parties specifically and precisely defined the terms that would give rise to a redemption event under this specific agreement, and as the district court properly found, every single defined term in this agreement is expressly premised on the existence of the Roche merger. And if you'll look very quickly to page 773 in the record, it's under little romanette three, entitled redemption events. And this defines the redemption events that give rise to the rights in this contract as number one, the equity sale defined term, and number two, the IPO event, another defined term. Now, both equity sale and IPO event themselves rely on an underlying defined term, which is the holdco. We've seen that before. And if you look right above in that same provision, you'll see that the equity sale is defined as a sale of the equity of the holdco. This is still on 773 and little romanette three. And if you flip back just one page then to 772, you'll see that down at the bottom of the very first full paragraph on the page, right above the section for agreed terms, it defines IPO event in quotes. And it defines it as when the holdco may be taken public. So the holdco is an important term here, and they define that right above in this same paragraph. And they define it to mean a holding company for the Mercuria Roche Nuco. That's a defined term. And that defined term is defined in the beginning of this paragraph. And it's defined to mean Mercuria and Roche are intending to merge interests owned by each of them, including ULA, quote, into either Roche or a new entity to be formed by Mercuria and Roche. And that is defined as the Mercuria Roche Nuco. There's another definition that echoes this. On page 774 of the record, in the middle of the page, it defines merger with a capital M to mean the formation of the Mercuria Roche Nuco and implementation of the Mercuria Roche Nuco documents, another defined term. And the fact is there is only one way to read this agreement. And you cannot get to a redemption event under this agreement without starting with the Mercuria Roche Nuco. And to read the contract in the way that Mr. Miller suggests, this court would need to disregard not just one or two discrete definitions, but multiple explicit definitions and provisions in this contract that repeatedly expressly limit his rights here under only to the Roche merger. Thank you. Thank you, Your Honors. May it please the Court, Randall Rayner for Appley's ULA and Phoenix Global. As Your Honors are aware, the sole basis upon which the judge below held ULA and Phoenix Global dismissed was on jurisdictional grounds, although it also stated it would dismiss Phoenix Global on the merits on the successor liability theory. As you're aware from the papers, the plaintiff abandoned its New York Contacts argument and pivoted to this closely related doctrine argument under the Forum Clause. As to ULA, the analysis is very simple. The plain language of the Forum Selection Clause does not cover the one claim in this case against ULA, which is a claim for breach of the ULA Articles of Association. And why is that? Because the Forum Clause language, Your Honors, covers three types of claims under the separation agreement. A claim to enforce the terms of the separation agreement, a claim arising from the separation agreement, or an action relating to the separation agreement. And under the In Re Optimal case, the relating to test means with reference to the separation agreement. If Your Honors look at Count 1 as alleged, it alleges solely breaches of obligations under the Articles of Association of ULA. There is zero enforcement of the separation agreement, much less a reference to it. And as you all have seen from the separation agreement itself, it emphasizes that nothing in it is to disturb the rights and obligations preexisting under the ULA Articles of Association. Therefore, that claim against ULA stands alone with no relation or dependency upon the separation agreement. As to Phoenix, Your Honors, this English holding company is being pulled into this case solely on the theory that it is supposedly closely related to the parties to the separation agreement. There are two tests in this district. There is the dependency and derivativeness test. Either the non-signatory must have been actively involved in the subject transaction of the agreement that has the forum clause, this being the separation between Miller and his former employer in 2012. Phoenix Global had no involvement, much less no active involvement, in that 2012 transaction. Also, the rights of ULA, which are argued to give rise to Phoenix's liability on a successor theory, also are not interests derivative of the separation agreement. The separation agreement emphasizes ULA's liability, if any, is decided under the Articles. It's not decided under the separation agreement. Maybe you can just, by describing the transaction at issue here, Judge Rakoff concluded that Phoenix was not sufficiently involved in the transaction, right? Correct. And what is the transaction, which is relevant here? You're probably retracing your steps, but I want to make sure that we forum selection clause is made applicable to the non-signatories. So it is the transaction under the separation agreement. So the transaction is the negotiated terms of departure of Mr. Miller from Mercuria. And how was Phoenix involved in the transaction? Phoenix is not involved in that transaction, Your Honor. There's no involvement in it whatsoever. Phoenix comes into the picture in 2017 as part of the share exchange transaction, which was happening at the parent levels, well above ULA. Under that transaction, which has been significantly misdescribed to this Court, ULA's assets were not stripped. It was an exchange of shares between Andes and upstream capital and Trefoil Holdings. Trefoil is the parent of ULA. Effectively, the structure of Trefoil on down was moved from underneath Mercuria to underneath Andes Energia, a pre-existing, active, well-capitalized mining company based in London with substantial mining activities in Argentina. It was then renamed Phoenix. Counsel said at least twice it was a shell created for the transaction. Phoenix Global was a name change of a longstanding operating parent company called Andes. In that transaction, ULA's assets were not stripped. ULA's assets are PETSA, the subsidiary it owns, which holds the GLACO and other mining rights. In the record, Your Honors, at A203 is a list of 19 highly valuable mining licenses that PETSA has and still has to this day as a subsidiary of ULA. ULA's assets were not touched by this transaction, the Phoenix Global transaction, which transpired by a mere exchange of shares two or three levels above it in the organizational structure. Finally, Your Honor, there is no basis for successor liability against Phoenix Global in this case because that transaction was a share exchange. The law is clear on this under Golub v. Kidder v. Peabody that in a share exchange rather than an asset exchange, there is no such liability. Do you have a view on whether we look to federal law or New York law in the interpretation of a closely related doctrine? The tests, Your Honor, appear to emanate from federal common law of the districts throughout the country and within the Second Circuit. However, it cannot be divorced from due process, Your Honor. The famous federal common law that we were once told didn't exist. Precisely, Your Honor. But at the end of the day, these entities based in Spain and England with zero traditional jurisdictional contacts, not even alleged here, cannot be disregarded. There has to be a comportment with due process, 14th Amendment, before those overseas entities can be made subject to a lawsuit in New York on the closely related doctrine or any other theory. Ms. Guerin. Thank you, Your Honors. In many ways, Mercuria's argument from our perspective is beside the point. We do not disagree that the Roche transaction was described in detail. We do not disagree that it contemplated a particular series of outcomes and that redemption events were described therein. Where we disagree is that if that deal doesn't close, then Mercuria has no obligations to Mr. Miller and that he needs to go to Spain. Our view is Mr. Miller left the employment of Mercuria. He signed a separation agreement with Mercuria and that detailed in various places, in very specific language, that in consideration for his work for Mercuria, he had rights to the Argentinian oil field asset. Not in consideration for his work with ULA. He didn't work with ULA. He worked for Mercuria. That was the source of his rights and that was the source of Mercuria's obligation and Mercuria took on that obligation. So citing to a subsection that refers again to ULA's articles of association, that only bolsters Mr. Miller's argument that the ULA obligations were fully incorporated into this separation agreement. Why were they named over and over five times? Because Miller and Mercuria agreed that those obligations were assumed by Mercuria. He would not, it is not reasonable to conclude that his separation agreement with his employer did not encompass the value of this asset. That he simply left it on the table to go sue in Spain. And to the extent that there's an issue of fact about whether or not ULA's shares still have value, that is a basis for a denial of a motion to dismiss. Remember, we are not at the summary judgment stage. We are only at the motion to dismiss stage. Mr. Miller's only obligation is to plead a plausible claim that Mercuria adopted the articles of association and those obligations. And at that low level of burden on Mr. Miller, we think the district court erred in finding that he had not met it. And the remedy you seek is? Reversal. Reversal. And permission to proceed with discovery and litigating the case normally. Or should the court somehow deem the complaint insufficient, leave to replead to remedy those errors? How would you side on the debate that we have among ourselves over whether it should be a reversal as opposed to a vacater? Well. You'll take either one. Very, very well put, your honor. Thank you. Sorry about that. It's a banana. Okay. Thank you very much. We reserve the decision, well argued by all, and we're grateful for your presence today.